## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TRENDSETTER INVESTORS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-0746 |
| | § | |
| HYPERDYNAMICS CORPORATION, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

This suit arises out of purchases of working-interest units in a 40-acre oil and gas lease in Louisiana known as the Willard Norris Lease. The plaintiff, Trendsetters Investors, LLC, purchased 30 investment units offered by Trendsetter Production Company. The purchases were made from March to October 2005 for a total price of $1.65 million. In this suit, the plaintiff alleges that it made the investments based on misrepresentations about the value of the oil and gas interests made by Trendsetter Production Company, its parent, Hyperdynamics Corporation, two officers and directors, and two consultants. The plaintiff alleges that the two corporate and four individual defendants made false and misleading statements and omissions, violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5, 17 C.F.R. § 240, as amended by the Private Law Securities Reform Act, 15 U.S.C. § 78u-4(b)(1). The plaintiff also alleges that Hyperdynamics is liable as a control person of Trendsetter Production and that three of

the four individual defendants are liable as control persons of either or both companies under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The plaintiff also alleges statutory fraud under Section 27.01 of the Texas Business and Commerce Code and under Article 581-33 of the Texas Securities Act as to all the defendants, control-person liability under the Texas Securities Act as to Hyperdynamics, Kent Watts, Harry Briers, and Michael Watts, and common-law fraud as to all the defendants.

The plaintiff amended the original complaint in response to the defendants' first motion to dismiss. The defendants have now filed two motions to dismiss the amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the motions at which counsel presented argument. Based on the pleadings, the motions and responses, the arguments of counsel, and the applicable law, this court grants in part and denies in part the motion to dismiss filed by Hyperdynamics, Trendsetter Production, Kent Watts, Harry Briers, and Michael Watts, and grants the motion to dismiss filed by Christopher Watts. The reasons are set out below.

## I.    Background

The amended complaint describes in detail the circumstances and the communications leading up to the plaintiff's purchase from Trendsetter Production of the 30 investment units at $55,000 per unit in the 40-acre Norris Lease in LaSalle Parish, Louisiana. Each unit represented one percent of the working interest in the Norris Lease. The plaintiff purchased 10 investment units between March 31, 2005 and April 15, 2005; another 10 investment units between May 2, 2005 and July 7, 2005; 3 units on July 22, 2005; and another 7 investment

2

units between July 28, 2005 and October 15, 2005. The plaintiff alleges that it made these purchases in reliance on false representations or omissions made by specific defendants who knew that the statements were false and misleading when made.  The following factual recitation is based on the amended complaint, the documents attached to or incorporated in the complaints, and public filings, all of which may be considered in deciding a Rule 12(b)(6) motion.[1]

### A.    The Parties

The plaintiff, Trendsetter Investors, LLC, was formed by a group of investors in March 2005 to purchase investment units offered by Trendsetter Production Company, a wholly owned subsidiary of Hyperdynamics Corporation.  The individual and corporate defendants dealt with the plaintiff through its representative, Stephen Moore, who owned S.D. Moore Financial, a brokerage firm.

Hyperdynamics is a publicly traded company in the oil and gas exploration and production business.  The plaintiff alleges that Hyperdynamics controlled Trendsetter Production and is liable for the misrepresentations and omissions on which plaintiff relied in making the $1.65 million investment in the Norris Lease.

The four individual defendants and their alleged roles in Hyperdynamics and Trendsetter Production are described below.

•     Kent Watts is the Chief Executive Officer, Chairman, and President of

---

[1]  The plaintiff challenges and moves to strike certain documents that the defendants attached to their motion to dismiss, on the ground that they were either falsified or not appropriately considered in deciding a motion to dismiss.  The motion to strike and response are analyzed below.

Hyperdynamics and the Chief Executive Officer of Trendsetter Production.  Kent Watts allegedly controlled the operations and communications of Hyperdynamics, which in turn allegedly controlled Trendsetter Production.

- Harry Briers is the Chief Operating Officer, Executive Vice-President, and a Director of Hyperdynamics and Vice-President of Trendsetter Production.  Briers is alleged to be a control person of Hyperdynamics and, in turn, Trendsetter Production.

- Michael Watts is the "primary consultant" of Hyperdynamics, with the "responsibility to help manage its public relations, general investor relations and shareholder communications."  (Docket Entry No. 22, ¶ 16).  Michael Watts is alleged to have had the "lead role in soliciting plaintiff's investment in the working interest offering."  (*Id.*, ¶ 24).  Michael Watts allegedly acted under the direction and control of Kent Watts, but is also alleged to be a control person of Hyperdynamics with respect to making statements and disseminating information relating to the investment offering at issue.  (*Id.*, ¶ 21).  Michael Watts is Kent Watts's brother.

- Christopher Watts is an "investment relations agent" for Hyperdynamics.  The only specific allegations relating to Christopher Watts are that he posted two statements on a blog on Hyperdynamics's

4

website, one on September 17, 2005, and one on October 5, 2005. The plaintiff has not alleged that Christopher Watts participated in most of the challenged communications or that he is liable as a control person.

One other individual plays a prominent role in the alleged representations. Sam Spears, the President of Trendsetter Production, is repeatedly identified as the source of accurate information about the Norris Lease and the value of the working-interest units the plaintiff purchased. The plaintiff alleges that Spears told the defendants accurate information but that they knowingly disseminated false information to induce the plaintiff to invest. The plaintiff also alleges that during the relevant period, Kent Watts and Harry Briers exercised such pervasive control over Sam Spears that they "ignored, overruled, and countermanded" his operational decisions, depriving him of "his authority for making business expenditures on behalf of Trendsetter Production" and ordering him to "provide signatures in blank which they then utilized in writing and issuing checks from accounts maintained by Trendsetter Production." (Docket Entry No. 22, ¶ 23). The plaintiff also alleges that Kent Watts, Michael Watts, and Harry Briers caused Hyperdynamics to "issue public press releases in which Spears was allegedly quoted," but that he had not in fact made the statements attributed to him. Instead, Kent Watts, Michael Watts, and Briers would "simply write out what they desired the statements to be and attribute them to Spears," including statements "directly contrary to what Spears had actually told them." (*Id.*). The plaintiff alleges that some of the statements purportedly made by Spears were in fact made by particular defendants and were false.

5

**B.     The Alleged Misrepresentations and Omissions**

The allegations in the first amended complaint as to the investments, the false statements, who made them, and the basis for asserting that defendants knew that they were false when made, are set out below.

*1.     The Alleged Misrepresentations Relating to the Initial Investments*

The plaintiff alleges that Hyperdynamics and Kent Watts represented in a press release issued on December 6, 2004 that Trendsetter Production had acquired "eleven new oil and gas leases located in proven reserve" and "historically producing areas" in Louisiana, which provided the "basis for its forecasts of steadily increasing revenues in the coming months." (Docket Entry No. 22, ¶ 37).  Shortly after this press release, Michael Watts began soliciting the plaintiff to invest in the Norris Lease working-interest offering.  (*Id*.).

In a press release issued on January 21, 2005, Hyperdynamics and Kent Watts represented that for the 14 planned wells on the Norris Lease, a subsidiary, Hyperdynamics Resources, had "budgeted a production rate from the combined wells on the Norris Lease of 400 barrels of oil per day by June 30, 2005." (Docket Entry No. 22, ¶ 45).  An investment marketing brochure dated February 15, 2005 from Trendsetter Production included a document setting out "projections" for the Norris Lease.  This brochure and a DVD were presented to the plaintiff (represented by Stephen Moore) in a meeting in early March 2005, attended by Michael Watts and Harry Briers.  The meeting was to solicit the plaintiff's investment in the Norris Lease offering.  (*Id.*, ¶ 40).  The brochure included projections that "wells on the first ten acres of the Norris Lease would produce 16,730 barrels in the first year

6

and a total of over 69,000 barrels over eight years." (*Id.*, ¶ 48). Based on these production rates, the brochure projected "an internal rate of return on Plaintiff's investment of 56%, and a 'worst case' time period of 2.5 years for Plaintiff to recoup its entire investment." (*Id.*). At the same meeting, the plaintiff saw a video from the DVD showing several wells, "purportedly from the Norris Lease," pumping oil. (*Id.*, ¶ 40).

The plaintiff alleges that in a meeting Moore attended on March 16, 2005 with Michael Watts and Sam Spears, Michael Watts stated that each existing well in the Norris Lease was currently producing 2 or 3 barrels of oil per day and one was producing 5 barrels. (*Id.*, ¶ 45). Michael Watts also allegedly asserted that once Hyperdynamics installed new production equipment, each well would produce 15 barrels of oil per day. (*Id.*, ¶ 45).

The plaintiff alleges that all these representations were false. As to the characterization of the Norris Lease as located in "proven" and "historically producing" areas, the plaintiff alleges that it was in fact in an "exploratory" or "developmental" area. The plaintiff alleges that

> [t]his was known to Defendant Hyperdynamics and Defendants Kent Watts, Michael Watts, and Harry Briers at the time these statements were made because, among other reasons, (1) Defendants had no reserve studies or other data which are required to substantiate the claim that the area was "proven" and "historically producing," and in fact had data to indicate to the contrary (including historical production data showing virtually *no* production from the lease in many years); and (2) because Sam Spears, the President of Defendant Trendsetter Production, who had over twenty years' experience in oil and gas production in that area of Louisiana, directly informed Defendant Kent Watts and Hyperdynamics, prior to the press release and representations to Plaintiff, that the area was not "proven" but

rather was merely "exploratory."

(Docket Entry No. 22, ¶ 39).

As to the representations that the existing wells on the Norris Lease were presently "producing oil"—made in the combination of the February 15, 2005 investment brochure and the video presented in the early March 2005 meeting—the plaintiff alleges that no oil was being produced from the Norris Lease in March 2005 and none was produced in "all of 2005." (*Id.*, ¶ 41).

As to the projected production rates set out in the January 2005 press release, the February 15, 2005 brochure, and the March 2005 meetings—that 16,730 barrels of oil would be produced from wells on the first 10 acres in the first year, and that each of the 14 planned wells would produce at least 15 barrels of oil per day for a combined 400 barrels of oil per day by June 30, 2005—the plaintiff alleges that "the wells on the Norris Lease were then, and had historically been, capable of producing at most two or three barrels per day." (*Id.*, ¶ 46).

The plaintiff alleges that before Kent Watts, Michael Watts, and Harry Briers made these statements, they had information from Sam Spears that:

> (i) the Norris wells could not produce more than two to three barrels of oil per well per day, (ii) only ten of the forty acres on the Norris Lease were capable of producing any oil, and (iii) the geological conditions of the reservoirs on the Norris Lease would require a large number of wells and frequent and extensive shut downs in order to extract the oil and gas to the maximum possible extent. Defendants had this knowledge before they began soliciting Plaintiff to invest in the offering, but deliberately misrepresented the value and risks of the investment in the face of this contrary information. Indeed, when Kent Watts and Michael Watts informed Sam Spears that

8

> they intended to sell the interests for $55,000 each, Spears
> remarked that if they could get that price they "could sell the
> man in the moon a new smile."  Later, when these defendants
> told Spears that they had indeed sold some interests to Plaintiff
> at that price, he responded, "Somebody's going to jail!"

(Docket Entry No. 22, ¶ 52).  The plaintiff alleges that these production rates were overstated

by "at least five hundred percent."  (*Id.*, ¶ 55).  According to the plaintiff, Sam Spears had

not only told "Kent Watts, Michael Watts, and Briers that the Norris Lease was not capable

of producing more than two or three barrels per day per well," but had also warned "that to

try to squeeze more daily production from the wells would only damage the field and reduce

the ability of the wells to produce the reservoir.  Prior to Plaintiff's investment, Defendants

Kent Watts, Michael Watts, and Briers had repeatedly pressured Spears to agree that the

wells would produce eight, twelve, or even fifteen barrels per day, but Spears repeatedly told

them they would not."  (*Id.*, ¶ 47).

The plaintiff alleges that in the early March 2005 meeting, Michael Watts represented

that this price was a "'sweetheart deal' that involved 'only two risks':  any decline in oil

prices and the possibility of occasional brief interruptions in production to shut down wells

for equipment repairs or workovers." (Docket Entry No. 22, ¶ 51).  The plaintiff alleges that

these representations were false when made and that Michael Watts knew they were false.

The plaintiff alleges that before soliciting the plaintiff's purchase, Michael Watts had offered

the landowner of the entire Norris Lease a total of $75,000 for his royalty interest in the

property—an interest "worth well more than twenty times the value of a one percent working

interest"—and had told Sam Spears that he "intended to 'flip' that royalty interest to an

investor for $500,000." (*Id.*, ¶ 53). The plaintiff alleges that based on the offer to the landowner and his statement to Spears, Michael Watts "knew when he solicited Plaintiff's investment that a one percent working interest in that lease was worth only about $7,500—not the $55,000 that he pitched to Plaintiff as a 'sweetheart deal' with 'only two risks.'" (*Id.*).

The plaintiff also alleges that Hyperdynamics, acting through Kent Watts and Harry Briers with Michael Watts's involvement, had paid only a few thousand dollars for the leasehold interest because the "low production rates did not support a substantial investment." (*Id.*, ¶ 49). The plaintiff also alleges that Michael Watts knew that the risk of production interruptions were far more than "occasional" or "brief" because Sam Spears had told the defendants, including Michael Watts, that the geological conditions on the Norris Lease would require "frequent and extensive shut downs in order to extract the oil and gas to the maximum possible extent." (*Id.*, ¶ 52).

Before making the initial investment at the end of March 2005, the plaintiff also received representations about two geological studies. In the February 15, 2005 investment brochure presented to Moore in early March 2005, Michael Watts provided a letter dated February 10, 2005 from Sam Spears. This letter described an "Engineering Report" by Charles Moffett. The letter stated that Moffett had studied 10 acres of the 40-acre Norris Lease and reported 69,000 barrels of recoverable reserves on those 10 acres. According to the complaint, the Spears letter stated that including the entire 40 acres and taking into account the available producing horizons would lead to an "estimate of barrels in

10

place . . . 600% higher than [Moffett's] estimate."  (Docket Entry No. 22, ¶ 60).  At the meeting, Michael Watts stated that Hyperdynamics intended to obtain a more detailed reserve report on the entire Norris Lease.  The plaintiff alleges that

> this characterization of the Moffett report was false in at least one material aspect: Defendant Hyperdynamics and its subsidiaries were already in possession of information indicating that out of the forty acres comprising the Norris Lease, only ten acres could be drilled for production; the remaining thirty acres had produced only dry holes in previous exploration attempts. Defendants never disclosed this information to Plaintiff, and in their investment brochure projection on February 15, 2005, defendants included figures for the "projected barrels over remaining 30 acres" on the Norris Lease.

(*Id.*, ¶ 61).

The representation as to the second geological study was made in a March 15, 2005 press release from Hyperdynamics.  This press release stated that Hyperdynamics had obtained an "independent and comprehensive geological study" on its "first producing lease" in Louisiana, which Michael Watts had previously identified to Moore as the Norris Lease. (*Id.*, ¶ 62).  The press release described the independent geological study as reporting an estimated 1,470,000 barrels of oil in place in two "horizons," with another possible 1,113,307 in two additional "virgin horizons."  (*Id.*).  In the press release, Kent Watts referred to this report as the basis for expecting to meet and exceed the production forecasts.  (*Id.*).  The plaintiff alleges that this characterization of the "independent and comprehensive geological study" of the Norris Lease was false in two material respects:

> First, the study in question reported 1.47 million barrels in place under 200 acres of land under lease to Hyperdynamics—not, as

11

> represented and implied in the press release, just under the 40
> acres of the Norris Lease, in which Defendants were soliciting
> Plaintiff's investment.  Moreover, the study specifically stated
> that there was insufficient current or historical production
> information to allow any estimation of the barrels that may be
> produced; it could not, therefore, provide any truthful basis for
> Defendants Kent Watts and Hyperdynamics to express hopes or
> expectations of 'surpassing' short term production forecasts.
> Yet that is precisely what these Defendants claimed in the
> March 15, 2005 press release . . . .

(*Id.*, ¶ 63).

On March 31, 2005, Moore and one of the plaintiff's investors, Jack Manning, signed the documents to invest in the Norris Lease.  The documents included a participation agreement, a confidentiality agreement and disclaimer statement, and a private placement investment letter.  The confidentiality agreement and disclaimer statement included the following language:

> [Plaintiff] understands that [Trendsetter Production] makes no
> other express warranty and disclaims all implied warranties,
> with respect to the information or the subject matter of this
> agreement, including, without limitation, any warranties as to
> (i) the quality, accuracy or completeness of the information,
> (ii) the presence of hydrocarbons within the properties, or
> (iii) the results which might be expected from any exploration,
> development, production and/or hydrocarbon marketing
> activities involving the properties.  Nothing contained in the
> information is or shall be relied upon as a promise or
> representation or warranty, whether as to the past, present or
> future oil & gas production or production potential involving the
> properties.

(Docket Entry No. 11, Ex. C, § 8).

The March 31, 2008 letter included the following language:

I acknowledge that you have furnished me with such financial, geological and other data relating to these oil, gas and mineral interests, as well as information as to your plan to develop and operate these interests, which I considered necessary or advisable to enable me to make an informed decision concerning my purchase of these interests.

I acknowledge that you have advised me of the speculative nature of oil and gas exploration and that I understand that there is risk involved in such an investment. I declare that I am an experienced investor, that I believe myself capable of assessing the risk involved.

(*Id.*, Ex. D).

By March 31, 2005, the plaintiff had delivered a $220,000 check to purchase 4 units. Within two weeks, the plaintiff purchased 5 more units with a $275,000 check that had the notation, "Final Payment (9 Units)."  (Docket Entry No. 22, ¶ 30).  On April 15, 2005, the plaintiff bought one more unit, for a total of 10 units for $550,000.

2.   *The Alleged Misrepresentations Leading Up to the Purchase of the Second 10 Units*

Between May 2, 2005 and July 7, 2005, the plaintiff purchased an additional 10 units.  (Docket Entry No. 22, ¶ 69).  The plaintiff alleges that in addition to the misrepresentations made before April 2005, the defendants made additional misrepresentations specifically relating to natural-gas production on the Norris Lease.

The plaintiff alleges that in a meeting on April 12, 2005 at Hyperdynamics's offices in Houston, Briers told Moore for the first time the "'news' that Hyperdynamics had discovered natural gas on the Norris Lease.  Defendant Briers told Moore that . . . this would cause a 'short-term delay' in beginning production on the wells while a gas gathering system

was installed and pipeline and sales contracts were obtained to market the gas, but that this discovery of gas would 'only be a positive' for the investors (Plaintiff)." (Docket Entry No. 22, ¶ 71). "[O]n May 10, 2005, Defendant Hyperdynamics issued a press release stating that it had completed its tenth well on the Norris Lease and that it was 'now working with a natural-gas pipeline company' to provide the facilities needed to produce and sell gas from the well along with oil. Defendant Hyperdynamics further stated in the press release that it 'expected' to complete these efforts and begin producing and selling gas and oil from the Norris Lease 'shortly.' The press release also contained a statement, purportedly by Sam Spears as President of Trendsetter Production, that 'these wells are low-risk shallow production.'" (*Id.*, ¶ 72). "On June 3, 2005, Defendant Hyperdynamics issued another press release announcing it had drilled twelve wells in Louisiana (*i.e.*, on the Norris Lease) and that 'all have encountered multiple pay zones and will all be completed and produced.' Defendant Hyperdynamics further stated in the press release that construction of production infrastructure for the wells was 'underway.'" (*Id.*, ¶ 74).

The plaintiff alleges that contrary to the statement made in the April 12 meeting, the discovery of gas on the Norris Lease was not "news"; Spears had told Kent Watts and Briers at the outset that they would "encounter gas on the lease." (Docket Entry No. 22, ¶ 73). According to the plaintiff, Spears also told Kent Watts and Briers that they needed to begin building a natural-gas gathering system and acquiring the infrastructure and contractual means for producing and selling the gas. (*Id.*). Spears allegedly told Kent Watts and Briers that the urgency resulted from the "particular geological features of the reservoirs under the

lease"; if the wells were shut in for an extended period, sanding problems would result and would "hinder, slow, or even destroy" the ability of the wells to produce oil and gas.  (*Id*.). "Spears informed these Defendants that, for this reason, a number of specific actions needed to be taken in order to commence production of natural gas from these wells as soon as possible in order to achieve maximum production rates and drainage of the reservoirs." (*Id*.). The plaintiff alleges that despite this knowledge, no work was done on the wells or gas-production infrastructure from July 2005 until November 2005.  (*Id*., ¶¶ 73, 77).

During this period, Hyperdynamics represented in a June 3, 2005 press release and Briers also told the plaintiff that construction of the production infrastructure was "underway" and that the "news" of the natural-gas discovery in the Norris Lease would result in only a short delay in producing oil and gas from the well.  (*Id*., ¶¶ 73–74, 77).  Between May 2, 2005 and July 7, 2005, the plaintiff purchased an additional 10 units.

### 3. The Alleged Misrepresentations Leading Up to the Purchase of the Final 10 Units

The plaintiff purchased an additional 3 units on July 22, 2005 and the final 7 units between July 28 and October 15, 2005.  The plaintiff alleges that in July 2005, Michael Watts and Kent Watts knew that the plaintiff was "beginning to have concerns about the efforts being taken to begin production from the wells."  (Docket Entry No. 22, ¶ 81).  On July 22, 2005, Michael Watts met with Moore and another of the plaintiff's investors, Jack Manning, to solicit the plaintiff to buy more units because Hyperdynamics was "in serious need of cash" and needed $150,000 immediately in order to meet its payroll.  At this meeting,

Michael Watts allegedly said that "everything was going great" in Louisiana and that the wells there were "sustaining the company's market value at that point." (*Id.*, ¶ 79). The plaintiff bought another 3 units for $165,000 on that date. (*Id.*). According to the amended complaint, Michael Watts failed to disclose that "Hyperdynamics had been notified several weeks earlier that the crucial component of its business strategy—an oil and gas concession from the government of Guinea on the West coast of Africa—had been terminated by the government of Guinea," a fact that "bore materially on Defendants' ability to obtain financing and continue as a going concern, including continuation of its production efforts in Louisiana." (*Id*., ¶ 80). That information was not disclosed until July 29, 2005. (*Id*.).

Michael Watts had another meeting with Moore and Manning on July 28, 2005. Watts presented Moore another marketing brochure, which stated that "an independent engineering study indicates 940,000 barrels of oil in place and a yet undetermined amount of gas on the Norris Lease." (Docket Entry No. 22, ¶ 64). The brochure projected 564,000 recoverable barrels of oil and "1,429,000 million Btus" of natural gas on the Norris Lease based on the "independent engineering study." Michael Watts projected "annual production rates of 47,000 barrels of oil from the Norris Lease over twelve years, with an internal rate of return of 219% and a total investment return of an impressive 820%." (*Id.*, ¶ 64). The plaintiff alleges that the brochure and the statements made by Michael Watts in the July 28, 2005 meeting were false. The plaintiff supports this allegation with Hyperdynamics's S-1 filing with the SEC in January 2006, which states: "We do not have a report from an independent petroleum engineer. We have not made any internal estimates of proved

developed and undeveloped reserves." (*Id*., ¶ 66).

In the July 28, 2005 meeting, Michael Watts presented a new offering that contained working interests in an additional lease, the Kelley Lease. The plaintiff alleges that this additional offering was part—but not all—of what Sam Spears told Michael and Kent Watts was "the only way" to add value to the plaintiff's investment to make up for the fact that "the Norris wells would not produce as they had represented." (Docket Entry No. 22, ¶ 81). Michael and Kent Watts allegedly asked Spears if he had any suggestions to add value to the investment to appease the plaintiff's investors and induce them to purchase additional units. The plaintiff alleges that Spears responded that "the only way to bring Plaintiff's investment returns up significantly would be to give them an equivalent share of the working interest . . . in the entire 200 acre area under lease to Hyperdynamics—that is, the entire Norris Lease, plus two additional leases, the Kelley Lease and the McGee Lease." (*Id*.). At the July 28, 2005 meeting, Michael Watts presented an investment brochure that included only the Kelley Lease in the offering. The investment brochure projected that the Kelley Lease would "double the revenue estimates in the previous investment brochure and produce an internal rate of return in excess of 200% and a total return of 820%." (*Id*., ¶ 82). The plaintiff alleges that the additional lease interest was included to cover up the previous acts of fraud, as well as to induce the plaintiff to invest additional funds. (*Id*., ¶ 83). In the July 28, 2005 meeting, Michael Watts "once again represented that Hyperdynamics 'desperately needed' to sell additional units in the Norris offering. Even then, however, Defendant Watts represented that this money would be used 'to focus on Louisiana' while efforts were made

17

to resolve the dispute over the Guinea concession."  (*Id.*, ¶ 80).

On July 28, 2005, the plaintiff agreed to purchase additional units.  On July 29, 2005, Hyperdynamics issued another press release containing a statement, purportedly by Sam Spears, that the 12 wells on the Norris Lease that had previously been drilled were merely "awaiting completion of a gas pipeline contract" that would allow the wells to begin producing and selling gas once the contract was finalized.  (Docket Entry No. 22, ¶ 74).  On September 16, 2005, Hyperdynamics issued another press release, announcing that the gas pipeline and gas-sales contracts had been finalized and that "it was now awaiting 'construction of a gathering system' for the natural gas."  (*Id.*, ¶ 75).  The plaintiff alleges that this not-yet-begun construction was the construction that Sam Spears had informed the defendants "would be necessary almost a year earlier" and that the June 3, 2005 press release had stated was "underway."  (*Id.*, ¶¶ 74–75).

On September 17, 2005, Christopher Watts made the following statement in a blog posted on Hyperdynamics's website:  "[A]t this moment in time, we are not producing any NG [natural gas], however we are currently working on updating our operations to handle the sales and production of NG," and that "the time to get the gas online should be anywhere from 3–6 weeks."  (Docket Entry No. 22, ¶ 76).  On October 5, 2005, approximately three weeks later, Christopher Watts  posted another blog on the Hyperdynamics website stating that "oil production is up for Louisiana operations" and that "Hyperdynamics Resources is still on track with gas production."  (*Id.*).  These are the only alleged misrepresentations attributed to Christopher Watts.

18

On October 10, 2005, in a phone call with Moore, Briers allegedly stated that the natural gas on the Norris Lease wells would be "hooked up . . . by the end of next week." (Docket Entry No. 22, ¶ 76).  Two days later, Briers wrote a letter to plaintiff's investors stating that "by the end of October," the gas collection system on the Norris wells would be "online" and that revenues would increase by approximately $23,500 per month thereafter. (*Id.*).  On October 15, 2005, the plaintiff purchased the final investment units, bringing the total to 30.

The plaintiff alleges that the statements as to the status of the construction of the natural-gas gathering and production infrastructure were false.  The construction was not "about to be completed 'shortly' (as Defendant Hyperdynamics represented) in May 2005, nor . . . 'underway' (as Defendant Hyperdynamics represented) in June 2005, nor . . . completed and awaiting finalization of a gas pipeline contract (as Hyperdynamics represented) in July 2005."  (Docket Entry No. 22, ¶ 77).  The plaintiff alleges that it later learned from the landowner of the Norris Lease that defendants "'did nothing' on the land—no work on the wells or production infrastructure whatsoever—from July 2005 until November 2005."  (*Id.*).  "[C]ompletion of the natural gas gathering system did not occur until at least mid-November.  Even then, production did not begin because of improper installation of the system and the need to rework some of the facilities.  When production did finally begin at the very end of November 2005, production was greatly hindered (in fact, almost completely prevented) by a significant sanding problem in the wells caused by having been shut in for months from April 2005 until November 2005—the very problem that Sam

19

Spears had informed defendants they would have if they did not commence construction of the natural gas gathering system he had told them would be necessary a year earlier." (*Id.*, ¶ 86).

The plaintiff alleges that no oil has been produced and no payments for oil received from the Norris Lease; 145 million cubic feet of natural gas has been produced and sold from the Norris Lease; and a total of 1,831.87 barrels of oil have been produced from the Kelley Lease, for an average of 11.97 barrels per day, generating $16,426.69 in production revenues. (Docket Entry No. 22, ¶ 88).

### 4. *The Allegations as to Motive*

The plaintiff alleges that the purpose of the fraudulent misrepresentations was to sell the Norris Lease working-interest units and obtain an inflated price. Kent Watts allegedly told Moore in April that Hyperdynamics had an inadequate cash position and was trying to book the sale to prevent a "going concern" comment in the financial statements for the prior quarter. (Docket Entry No. 22, ¶ 31). The plaintiff alleges that the misrepresentations were also motivated by the fact that in July 2005, Hyperdynamics learned that its oil and gas concession in Guinea had been terminated. (*Id.*, ¶ 80). The plaintiff also alleges that "Kent Watts and Harry Briers both have significant stock holding in Hyperdynamics (36.9% and 3.1%, respectively) and therefore had a personal stake in keeping the Hyperdynamics stock price high and preventing the dilution of stock." (*Id.*, ¶ 87).

### 5. *The Allegations as to Falsifying Documents*

The plaintiff alleges that the parties left the number of units to be purchased blank in

the March 31, 2005 participation agreement and investment letter.  Four units had been sold at that time—for a total of $220,000.  (Docket Entry No. 22, ¶ 29).  The plaintiff expected to purchase more but did not commit to a specific number.  By April 15, 2005, the plaintiff had purchased an additional 5 units, paying with a check for $275,000, which stated, "Final Payment (9 Units)."  (*Id.*, ¶¶ 29–30).  Moore agreed to purchase one additional unit, for a total of 10, and wrote the number "10" on the blank left on the investment letter.  After this suit was filed, the defendants filed a motion to dismiss and attached copies of the participation agreement and the investment letter.  The plaintiff alleges that these documents had been altered without its knowledge or consent.  The first page of the participation agreement did not have a blank for the number of units being purchased, but instead showed a commitment for the plaintiff to buy 20 units, with $220,000 to be paid immediately and the balance within 60 days.  The investment letter allegedly had been changed as well; the number "10" that Moore had written by hand was changed to "20."  (*Id.*, ¶ 33).  The plaintiff alleges that it never signed a contract agreeing to buy 20 units and that the defendants submitted falsified documents to support their claim that the plaintiff did not rely on defendants' information in purchasing 20 of the 30 units because it had contractually agreed to make the investment.  (*Id.*, ¶ 36).

## C. The Motions to Dismiss

The defendants have filed two motions to dismiss.  One is filed on behalf of Hyperdynamics, Trendsetter Production, Kent Watts, Michael Watts, and Harry Briers.  (Docket Entry No. 28).  The second is filed on behalf of Christopher Watts, who is not

21

alleged to be a control person and who the plaintiff admits is the least involved of the individual defendants.  (Docket Entry No. 29).  The defendants argue that the plaintiff has not met the securities-fraud pleading requirements of attribution, particularity, and scienter.  (Docket Entry No. 28 at 5).  The plaintiff responds that it has satisfied the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.  (Docket Entry No. 33).  The motions to dismiss are examined as to each category of misrepresentation alleged and each of the alleged pleading deficiencies.

## II.    The Legal Standards

### A.    The Federal Rules Pleading Standards

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  A Rule 12(b)(6) motion should be granted only if it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002).  "In order to avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations.  We will thus not accept as true conclusory allegations or unwarranted deductions of fact."  *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) (internal citations, quotation marks, and ellipses omitted).

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc*., 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Tech., Inc*., 112 F.3d 175, 177 (5th Cir. 1997)). Securities fraud and state-law fraud allegations are subject to the pleading requirements of Rule 9(b). *See, e.g.*, *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 69–70 (2d Cir. 2001).

### B.   The Pleading Standards Under the Securities Act

#### 1.   *Section 10(b) and Rule 10b-5 of the Exchange Act*

Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated to enforce Section 10(b), makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff

23

relied (5) that proximately caused the plaintiff's injury. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407 (5th Cir. 2001) (quoting *Tuchman*, 14 F.3d at 1067).

Claims under Section 10(b) and Rule 10b-5 must also satisfy the enhanced pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. The PSLRA "was enacted in response to an increase in securities fraud lawsuits perceived as frivolous." *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003). The PSLRA requires that to allege a material misstatement or omission, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). Its pleading requirements incorporate Rule 9(b)'s fraud-pleading standard, requiring a plaintiff to specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent. *Id.*; FED. R. CIV. P. 9(b). A district court must dismiss a securities-fraud claim failing to satisfy either the PSLRA's pleading requirements or those of Rule 9(b). *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citing *ABC Arbitrage*, 291 F.3d at 350).

To survive a motion to dismiss a securities-fraud action, the plaintiff must plead

24

specific facts establishing a strong inference of scienter.  *Zonagen*, 267 F.3d at 407.  Under the PSLRA, failure adequately to plead scienter requires dismissal of the complaint.  15 U.S.C. § 78u-4(b)(3)(A).  Scienter can be established by demonstrating the intent to deceive, manipulate, or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).  The Fifth Circuit has defined scienter as an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Southland*, 365 F.3d at 366 (internal citations, quotations, and ellipsis omitted).  A plaintiff may establish scienter by demonstrating either intent or severe recklessness.  *See Zonagen*, 267 F.3d at 408.  Severe recklessness is defined as highly unreasonable omissions or misrepresentations demonstrating an extreme departure from standards of ordinary care, not merely simple or even inexcusable negligence that present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant must have been aware of it.  *Id.*  Circumstantial evidence can support a strong inference of scienter.  *Id.*

The plaintiff must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant; so-called group pleadings are insufficient.  *See Southland*, 365 F.3d at 364–65 (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud").  For the claimed fraud, the plaintiff must distinguish among defendants and allege the role each defendant played.  *See Barrie v.*

*Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir. 2005) (recognizing the group-pleading ban under *Southland* and allowing the allegation that one defendant made a statement and the other remained silent despite knowledge that the statement was false). Corporate officers are not liable for acts or statements solely because they are officers, even when their day-to-day involvement in the corporation is alleged. Corporate statements can be tied to individual officers if the plaintiff alleges that the officers signed the documents in which the statements were made or alleges their involvement in creating the documents. "[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." *Southland*, 365 F.3d at 363–65.

In determining whether the plaintiff has alleged facts that give rise to a strong inference of scienter, the factual allegations in the complaint must be considered *in toto*. *See Barrie*, 397 F.3d at 250–60. The court must "engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak." *Rozenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003); *Zonagen*, 267 F.3d at 425 (determining whether all the facts and circumstances taken together support the necessary strong inference of scienter).

Although this court must consider all the plaintiff's allegations to determine whether they support a strong inference of scienter, the plaintiff must plead facts to support a strong inference of scienter as to each defendant for each alleged false or misleading statement. *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall, with respect to each act or omission alleged

to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); *see also In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001) ("For each alleged misstatement or omission, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false . . . .").  A plaintiff cannot simply lump together all of the scienter allegations in his complaint and assert that, taken together, they establish a strong inference of scienter in some general sense.  In cases in which the plaintiff alleges multiple misstatements or omissions, a factual allegation suggesting that a defendant knew that one particular statement was false or misleading might be irrelevant to the question of whether that defendant knew that a different statement was false or misleading.

In this case, the plaintiff has alleged both motive and opportunity and conscious misbehavior; the defendants challenge the sufficiency of the facts alleged as to both. "Motive" entails concrete benefits that could be realized as a result of one or more of the alleged false statements or omissions; "opportunity" entails the means and likely prospect of achieving concrete benefits by the means alleged.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  The Fifth Circuit "requires more than allegations of motive and opportunity to withstand dismissal."  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250–51 (5th Cir. 2003).  However, "appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter."  *Zonagen*, 267 F.3d at 412. But allegations of a need to raise capital, the desire for enhanced incentive compensation, and

27

the desire to sell stock at inflated prices are insufficient motivations upon which to proceed in a securities-fraud action. *Abrams*, 292 F.3d at 434. "Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations fail. . . . It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." *Id.*

### 2. Control-Person Liability

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud. That section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The statutory language identifies two components to a control-person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant. *Southland*, 365 F.3d at 383–84. Control-person liability under Section 20(a) requires an underlying violation of the Exchange Act by the controlled person; however, primary liability by the controlling person is not a necessary predicate to a Section 20(a) claim. *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). Control-person liability is secondary only and cannot exist in the absence of a primary

violation.  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

Section 20(a) must therefore be pleaded only in accordance with Rule 8(a).  Neither the

PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an

essential element), apply to a Section 20(a) claim.  The plaintiff need only allege a primary

violation by the controlled person and control of the primary violator by the defendants.  *See*

*Brody v. Zix Corp.*, No. 3:04cv1931-K, 2006 WL 2739352, at *9 (N.D. Tex. Sept. 26, 2006).

## III.    The Plaintiff's Motion to Strike Certain Exhibits

The plaintiff moves to strike Exhibits A and D attached to the motion to dismiss the

original complaint.   These exhibits—the participation agreement and the investment

letter—are objected to on the ground that they were "materially altered since the signatory

for the Plaintiff (Stephen Moore) signed the original documents on March 31, 2005."

(Docket Entry No. 33 at 9).  The plaintiff also moves to strike Exhibits D and F to the motion

to dismiss the amended complaint.  Exhibit D is the Bayou Resources Ltd. report to which

the plaintiff protests that it did not refer or rely; rather the plaintiff asserts that it relied on the

representations regarding the report in the March 11, 2005 Hyperdynamics press release.

Exhibit F is a petition filed in state court by some of the individuals who invested in or

represented the plaintiff, including Jack Manning and Stephen Moore.  The plaintiff argues

that it did not refer to the state-court petition in this case.  (*Id.* at 6).

In considering a motion to dismiss for failure to state a claim, a district court must

limit itself to the contents of the pleadings, including attachments.  FED. R. CIV. P. 12(b)(6).

The Fifth Circuit is among those circuits holding that documents a defendant attaches to a

motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim.  *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d  496 (5th Cir. 2000); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  In addition, in securities-fraud actions, courts may consider matters of public record, such as public disclosure documents that have been filed with the Securities Exchange Commission, without converting the motion into one for summary judgment.  *See Blackwell*, 440 F.3d at 286; *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

The amended complaint's allegations as to the falsification of Exhibits A and D attached to the motion to dismiss the original complaint are properly considered in judging the sufficiency of the pleading.  But to the extent the plaintiff asks this court to strike both documents from the motions to dismiss and to ignore the disclaimer language, that request is denied.  The plaintiff does not deny that it signed the documents.  Nor does the plaintiff allege that the disclaimer language in both documents was modified or altered after the plaintiff signed.

The motion to strike Exhibit D, the Bayou Resources, Ltd. March 2005 report, is also denied.  The plaintiff referred to this report in its amended complaint in alleging that the defendants knew that the characterization of the report in the March 11, 2005 public press release was false.  *See Irby*, 326 F.3d at 648.  The motion to strike Exhibit F, the state-court

petition filed by several of plaintiff's investors against Hyperdynamics and Kent Watts in

July 2006, is also denied.  A district court may properly take judicial notice of filings in other

court proceedings.  *See Davis*, 70 F.3d at 372 n.3 (noting that the district court did not err by

taking judicial notice of state court orders); *Cinnel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th

Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to

matters of public record.").

## IV.    Analysis of the Alleged Misrepresentations

The alleged misrepresentations include statements as to whether the Norris Lease

contained "proven reserves" with wells that were "currently producing oil"; statements as to

the production rates of wells on the Norris Lease; statements as to the risks and value of the

investment; statements as to geological reports; and statements as to the natural-gas

production on the Norris Lease.

### A.    The December 6, 2004 Press Release

The defendants assert that the allegations as to the statement in the December 6, 2004

press release are deficient because the press release "referred to eleven leases, not one and

spoke about these leases in general terms."  (Docket Entry No. 28 at 6).  The defendants

assert that there is no basis for the allegation that this statement even referred to the Norris

Lease.  The defendants also assert that the representation actually made, that the leases were

located in "historically producing, proven *areas* is true, not false."  (*Id.* at 7) (emphasis

added).  The defendants refer to public records showing that the Norris Lease is located in

the Rogers Field, which has produced significant amounts of oil and gas over time.  Finally,

31

the defendants point out that the plaintiff itself alleges that the wells on the Norris Lease had historically been "capable of producing at most two or three barrels per day." (*Id.* at 12) (quoting Docket Entry No. 22, ¶ 46). The defendants' argument appears to be that 2 or 3 barrels per day may not be as much as was represented, but it was historical proven production.

The defendants' first argument, that the press release was not about the Norris Lease, is unconvincing. The only leases that Hyperdynamics and Trendsetter Production owned in Louisiana were the "eleven new leases" referred to in the December 2004 press release; these 11 new leases clearly included the Norris Lease. The press release preceded the solicitation efforts directed to induce the plaintiff to invest in the Norris Lease.

The defendants' second argument, that the press release is not a misrepresentation, requires closer analysis. The press release does not specifically refer to any particular lease. Instead, it states that the 11 leases were "in historically producing areas." The plaintiff appears to allege that this is equivalent to a specific representation that each of the leases contains a historically proven reserve. (Docket Entry No. 33 at 8). This argument attributes more specificity to the press release than its words permit. The press release simply says that the 11 leases are "in historically producing areas." The press release does not say that any particular lease—including the Norris Lease—has in the past produced oil or is likely to do so in the future. The December 4, 2004 press release and Kent Watts's statement in that press release are not, in themselves, a misrepresentation that the Norris Lease is a "historically producing" area.

The motion to dismiss the allegations with respect to the December 4, 2004 press release is granted.

### B.     The January 21, 2005 Press Release, the February 15, 2005 Investment Brochure and Video, the March 11, 2005 Press Release, and the March 2005 Meetings

The defendants move to dismiss the allegations that a statement in the January 21, 2005 press release—that Hyperdynamics Resources had budgeted production of 400 barrels per day—was a misrepresentation on the basis that the press release did not specifically mention or refer to the Norris Lease. The amended complaint alleged that the January 21, 2005 press release stated that Hyperdynamics Resources had budgeted this production rate for the "combined wells" on the Norris Lease alone. The defendants respond that the press release clearly referred to all of Hyperdynamics's Louisiana leases, not just the Norris Lease. (Docket Entry No. 28 at 9). The plaintiff argues that the press release relates to a reserve study performed by Charles Moffett, which in turn related only to the Norris Lease. (Docket Entry No. 33 at 10).

The January 21 press release was referred to in the original and amended complaints and attached to the initial motion to dismiss. (Docket Entry No. 11, Ex. E). This press release refers to an initial report of a planned reserve study of Hyperdynamics Resources's acreage. The release stated that the initial report revealed recoverable reserves of over 66,000 barrels. The initial report referred to appears to be the Moffett report on the Norris Lease. The press release quoted Sam Spears as saying that this initial report covered only 10 acres of the approximately 580 acres Hyperdynamics Resources had under lease. But the

33

press release clearly discusses more than the company's plans for the "very small area" studied in the initial report.  Kent Watts's statement about a budgeted production rate of 400 barrels per day by the end of fiscal year June 2005 is not limited to the "initial reported reserves" in the Norris Lease, but instead clearly relates to all the company's Louisiana leases.  The plaintiff's argument that this press release is a misrepresentation because it refers to an unreasonably high projected production rate on the Norris Lease is not supported by the language.  The allegation that the January 2005 press release is a misrepresentation is dismissed.

The defendants also move to dismiss the allegation that giving the plaintiff a DVD showing a pumping well at the March 2005 meeting was a misrepresentation that on that date, existing wells on the Norris Lease were producing oil.  There is no allegation that any of the defendants stated that the wells shown on the video were producing certain amounts of oil as of a particular date.  The plaintiff acknowledges that there were existing wells on the Norris Lease that had been producing oil before March 2005 and did so after March 2005.  The plaintiff has failed to allege that the video provided at the March 2005 meeting was a misrepresentation of any material fact.  The allegation is dismissed for failure to meet the requisite pleading standards.  *Zonagen*, 267 F.3d at 407.

The plaintiff also alleges that at the March 16, 2005 meeting, Michael Watts specifically told Moore, the plaintiff's representative, that the Norris Lease wells would each produce 10 to 15 barrels per day.  (Docket Entry No. 22, ¶ 45).  The plaintiff alleges that when Michael Watts made this statement, he knew it was false but made it to induce

34

additional investment.  The plaintiff alleges that Spears repeatedly told Michael Watts that the Norris Lease wells were not capable of producing 10 to 15 barrels of oil per day, but realistically were capable of producing only between 2 and 3 barrels per day.  (*Id.*, ¶ 47).  Spears also allegedly told Michael Watts that attempts to produce more than 2 or 3 barrels per day from the Norris Lease wells would likely result in damage to the field and further inhibit production from those wells.  (*Id.*).  The plaintiff has adequately pleaded a specific misrepresentation made by an identified defendant on a particular date and alleged details as to why this defendant knew it was false.  The motion to dismiss the claim that Michael Watts misrepresented the production potential of the Norris Lease at the meeting on March 16, 2005 is denied.

The plaintiff alleges that this projected production rate was incorporated into the February 15, 2005 investment brochure issued by Trendsetter Production and provided to the plaintiffs by Michael Watts in March 2005.  (Docket Entry No. 22, ¶ 48).  The plaintiff alleges that this brochure stated that wells on the first 10 acres of the 40-acre Norris Lease were projected to produce 16,730 barrels in the first year and over 69,000 barrels over 8 years.  The parties offer different arithmetical arguments to support their assertions that these projections were or were not consistent with Michael Watts's representation of 10 to 15 barrels per day or with the historical amounts of 2 to 3 barrels per day.  The plaintiff asserts that this projection assumed an average production rate of 13.096 barrels per well per day for the first year, consistent with Michael Watts's earlier representation, and that the defendants knew this was false.  (Docket Entry No. 33 at 11).  The plaintiff alleges that Spears had told

the defendants, including Hyperdynamics, Trendsetter Production, Kent Watts, and Michael Watts, that only 10 of the 40 acres on the Norris Lease were capable of producing any oil and that the other 30 acres had produced dry holes in previous exploration attempts.  (Docket Entry No. 22, ¶¶ 52, 61).  The defendants assert that the 8-year production rate was for the entire lease and that a similar arithmetic exercise for the projected 69,000 barrels over 8 years for the entire lease leads to an average per-well production of 1.688 barrels of oil per day.  (Docket Entry No. 28 at 10).

Neither party has made the February 15, 2005 brochure a part of the record in this case.  Nonetheless, the allegation survives the motion to dismiss.  If the brochure projected 69,000 barrels over 8 years for the first 10 acres of the Norris Lease, the 8-year projection does not appear inconsistent with Michael Watts's statement projecting 10 to 15 barrels per well on the Norris Lease.  If the brochure projected 69,000 barrels over 8 years for the entire 40 acres, the plaintiff has alleged that this was materially misleading because the defendants knew that only 10 acres of the Norris Lease could produce oil.  The defendants do not address the allegation that if the reasonable projected production rate was no more than 2 to 3 barrels per day for 14 wells for the entire Norris Lease, then the projections for the plaintiff's rate of return—56% and a "worst case" period of 2.5 years for the plaintiff to recoup its entire investment—were not feasible.

The motion to dismiss the misrepresentation allegations as to the projected production rate and the rate of return in the February 2005 investment brochure and the statements made by Michael Watts at the March 2005 meeting is denied.  The allegations meet the test of

36

particularity. The plaintiff has alleged facts that show that Trendsetter Productions and Michael Watts had information, primarily from Spears, that these production and rate-of-return projections were unreasonable and that the $55,000 value of each investment unit was overstated. If, as the defendants argue, the projected production rates were limited to 2 to 3 barrels per day, the projected rates of return are not supportable. If, as the plaintiff argues, the projected production rates were 10 to 15 barrels per day, that is consistent with the projected rates of return, but unreasonable in light of the information that Spears had allegedly provided. The allegations in the amended complaint that Michael Watts attempted to buy the 20% leasehold interest for $75,000 and stated that he intended to flip this interest for $500,000 are also properly considered as allegations of motive, which "may meaningfully enhance the strength of the inference of scienter." *Zonagen*, 267 F.3d at 412. The alleged misrepresentations as to the production rates and rates of return are material and the plaintiff has adequately alleged scienter. *Zonagen*, 267 F.3d at 407.

The plaintiff also asserts that Kent Watts, Michael Watts, and Harry Briers all pressured Spears to agree that the Norris Lease wells would produce larger amounts of oil than Spears knew to be the case. (Docket Entry No. 22, ¶ 47). The plaintiff has sufficiently alleged that Kent Watts and Harry Briers are responsible for the February 2005 investment brochure issued by Trendsetter Production. *Southland*, 365 F.3d at 363–65.

The defendants move to dismiss the allegations that in early March 2005, Michael Watts misrepresented the risks of investing in the Norris Lease by stating that the investment carried only the risk of a decline in oil prices and the possibility of brief interruptions in

production for equipment repairs.  (Docket Entry No. 28 at 11).  The plaintiff alleges that Michael Watts knew this representation was false because Sam Spears had previously told him (as well as Kent Watts and Harry Briers) that the particular geological features of the Norris Lease required frequent and extensive well shutdowns to achieve a higher production rate.  The amended complaint alleges that when Michael Watts made this statement, he had been told by Sam Spears that the "geological conditions of the reservoirs on the Norris Lease would require a large number of wells and frequent and extensive shutdowns in order to extract the oil and gas to the maximum possible extent."  (Docket Entry No. 22, ¶ 52).  These allegations as to what the defendants knew at the time of the alleged misrepresentation are properly considered in determining the whether the plaintiff has adequately alleged scienter. These allegations also survive the motion to dismiss; they allege the requisite materiality, particularity, and scienter.

The defendants also move to dismiss the allegations that as part of the February 15, 2005 investment package, Michael Watts misrepresented Charles Moffett's engineering report.  Michael Watts provided the plaintiff a letter purportedly signed by Sam Spears describing this report.  The letter stated that the report studied 10 acres of the 40-acre Norris Lease and showed "69,000 of recoverable reserves."  (Docket Entry No. 22, ¶ 60; Docket Entry No. 28, Ex. C).[2]  The letter goes on to state that "updated engineering reports will

---

[2] The defendants argue that the letter from Spears only refers to 69,000 barrels in place, not 69,000 recoverable reserves.  "Never once does Mr. Spears represent how many barrels of oil could be *recovered*." (Docket Entry No. 28 at 13).  The letter bearing Spears's signature, dated February 10, 2005, refers to Moffett's report as showing "recoverable reserves" and "barrels in place."  (Docket Entry No. 28, Ex. C).

undoubtedly show that Mr. Moffett's assessment of barrels in place must be increased at least 600%.  This is a very reasonable figure if you take the numbers he now has, add the entire 40 acres, add the wells he discounted and the additional zones."  (Docket Entry No. 28, Ex. C).  The plaintiff alleges that this letter was false because it omitted information that Hyperdynamics and Michael Watts allegedly already knew: that only 10 acres could be drilled for production and that the other 30 acres had produced dry holes in prior exploration attempts.  (Docket Entry No. 22, ¶ 61).  The defendants move to dismiss the allegations as to what Spears told them on the ground that the allegations contradict another statement in the letter from Spears, which states that the entire 40 acres, not merely 10 acres, would have to be taken into account in evaluating potential production.  (Docket Entry No. 28, Ex. C). The plaintiff has alleged that Spears did not in fact make statements that were publicly attributed to him.  (Docket Entry No. 22, ¶ 23).  The plaintiff has adequately pleaded that Michael Watts and Hyperdynamics misrepresented the Moffett report.

The defendants also move to dismiss the allegation that a March 11, 2005 press release issued by Hyperdynamics misrepresented a second geological study, this one by Bayou Resources, Inc.[3]  This press release stated that Hyperdynamics had obtained an "independent and comprehensive geological study" on its "first producing lease" in Louisiana, which, according to the amended complaint, Michael Watts had previously identified to Moore as the Norris Lease.  (Docket Entry No. 22, ¶ 62).  The press release

_____

[3]  The plaintiff refers to this press release as the March 15, 2005 press release; however, the press release appears to have issued on March 11, 2005.  (Docket Entry No. 11, Ex. F).

described the "independent geological study" as reporting an estimated 1,470,000 barrels of oil in place in two "horizons," with another possible 1,113,307 in two additional "virgin horizons." (*Id*.). In the press release, Kent Watts referred to this report as the basis for expecting to meet and exceed production forecasts. (*Id*.). The plaintiff alleges that this characterization of the "independent and comprehensive geological study" of the Norris Lease was false in two material respects.

> First, the study in question reported 1.47 million barrels in place under 200 acres of land under lease to Hyperdynamics—not, as represented and implied in the press release, just under 40 acres of the Norris Lease, in which Defendants were soliciting Plaintiff's investment. Moreover, the study specifically stated that there was insufficient current or historical production information to allow any estimation of the barrels that may be produced; it could not, therefore, provide any truthful basis for Defendants Kent Watts and Hyperdynamics to express hopes or expectations of "surpassing" short term production forecasts. Yet that is precisely what these Defendants claimed in the March [11], 2005 press release.

(*Id*., ¶ 63).

The defendants move to dismiss the allegation that the March 11, 2005 press release is a misrepresentation of the Bayou Resources March 2005 report, submitting a copy of both the press release and the report. (Docket Entry No. 11, Ex. F; Docket Entry No. 28, Ex. D). The Bayou Resources March 2005 report studied the "area surrounding" the Norris Lease, specifically three horizons "located primarily in the northwestern portion of Section 8 of Township 6 North—Range 3 East, LaSalle Parish, Louisiana." (Docket Entry No. 28, Ex. D at 1). The report is not limited to the 40-acre Norris Lease, but rather includes the "area

surrounding" the Norris Lease.[4]

The plaintiff's argument that the March 2005 press release misrepresents the Bayou Resources report's conclusion that the estimates are of oil "in place" as opposed to "recoverable" is not supported by the language.  The press release carefully notes that the study does not estimate recoverable barrels of oil, only barrels in place.  (Docket Entry No. 11, Ex. F).  The plaintiff's argument that the March 11, 2005 press release misrepresented the study's conclusions as applying to the Norris Lease alone is not similarly supported by the language, which clearly states that the geological study was of producing zones "associated with and surrounding" the first producing lease in Louisiana, the Norris Lease. The allegation that the March 11, 2005 press release misrepresented the Bayou Resources March 2005 geological report is dismissed.

### C.    The April 12, 2005 Meeting and the May and June 2005 Press Releases

The defendants move to dismiss the allegations that in a meeting on April 12, 2005 and in press releases issued on May 10 and June 3, 2005, Harry Briers and Hyperdynamics misrepresented the timetable for producing gas from the Norris Lease.  In the April meeting, Briers told Moore that Hyperdynamics had "discovered" natural gas on the Norris Lease,

---

[4] The plaintiff argues that this March 2005 geological report studied the Wilcox Formation, which is to the northeast of the Norris Lease.  (Docket Entry No. 33 at 15).  The Bayou Resources report that studied the Wilcox Formation, however, was issued in June 2005 and is not the subject of the March 11, 2005 press release.  Similarly, the plaintiff argues that the Bayou Resources report obtained open hole logs and sidewall core information from private companies, including for the "Cockfield-3 horizon of the Wilcox Formation." (*Id.*).  The March 2005 Bayou Resources report discussed the Cockfield-3 horizon; the June 2005 report discussed the Wilcox Formation.  The plaintiff's argument appears to combine two separate Bayou Resources reports, only one of which is the subject of the March 11, 2005 press release.

allegedly misrepresenting this as a surprise, as opposed to something Spears had been telling them from the beginning of Hyperdynamics's involvement in the Norris Lease.  Briers told Moore that there would be a "short-term delay" in beginning production on the wells while a gas-gathering system was installed and pipeline and sales contracts were obtained to market the gas.  (Docket Entry No. 22, ¶ 71).  The plaintiff's allegation as to Briers's statement makes clear that both construction and contract negotiation had to take place.  The plaintiff does not allege that Briers provided a specific timetable for the completion of these tasks.

The plaintiff alleges that contrary to Briers's statement the discovery of gas on the Norris Lease was not "news"; Spears had told Kent Watts and Harry Briers at the outset that they would "encounter gas on the lease."  (Docket Entry No. 22, ¶ 73).  This is not, as the defendants point out, inconsistent with the March 11, 2005 press release in which Spears was quoted as saying that finding gas was unexpected at shallow depths and that the gas encountered was a "virgin reservoir."  (Docket Entry No. 11, Ex. F).  Nor is it inconsistent with the May 2005 press release describing the "nice surprise" as not merely finding gas but substantial quantities of high-quality gas.  (*Id.*, Ex. G).

On May 10, 2005,  Hyperdynamics issued a press release that allegedly stated that it was working with a natural-gas pipeline company to provide the facilities needed to produce and sell gas along with oil and "'expected' to complete these efforts and begin producing and selling gas and oil from the Norris Lease 'shortly.'"  (Docket Entry No. 22, ¶ 72).  The defendants move to dismiss this allegation because it misquotes the press release.  The press release stated that Hyperdynamics Resources was "working with a natural gas company to

42

provide the engineering requirements necessary to start selling its gas simultaneously, along with its oil. While the company has been completing the first 10 wells of 14 that are planned for the property, it has also been installing and renovating the production facilities to allow for optimum flow rates. This work is all expected to be completed shortly." (Docket Entry No. 11, Ex. G). This does not, as plaintiff alleges, state that Hyperdynamics was already constructing gas-production infrastructure; instead, it states that Hyperdynamics is still working on the "engineering requirements" for selling gas.

The plaintiff alleges that in a June 3, 2005 press release, Hyperdynamics announced that construction of gas-production infrastructure for the wells was "underway." (*Id.*, ¶ 74). The June 3, 2005 press release states that Hyperdynamics planned to drill and complete 75 wells in LaSalle Parish by the end of the third fiscal quarter of the following year. The press release also states that 12 wells had been drilled to date and each would be completed and produced. The next sentence states: "Construction of production infrastructure is underway so that production can be maximized." (Docket Entry No. 11, Ex. H). The press release does not specifically refer to the construction of gas-production infrastructure. This language does not support the plaintiff's argument that it is a misrepresentation. The allegations of misrepresentations made in the April 2005 meeting, the May 2005 press release, and the June 2005 press release are dismissed.[5]

---

[5] The plaintiff also alleges that during this period, Kent Watts and Harry Briers had information from Sam Spears that they needed to begin building a natural-gas gathering system and acquiring the infrastructure and contractual means for producing and selling the gas as soon as possible to achieve maximum production rates, but that no work to install the gas infrastructure was done until November 2005. (*Id.*, ¶¶ 73, 77). These allegations are not of a specific misrepresentation. Rather, they assert additional facts to support the

### D.    The July 22, 2005 Meeting, the July 28, 2005 Marketing Brochure, and the July 29, 2005 Press Release

The plaintiff alleges that at the July 22, 2005 meeting, Michael Watts told Moore and Manning that Hyperdynamics was in "serious need of cash" and would not meet its payroll unless it immediately received $150,000 in cash. (Docket Entry No. 22, ¶ 79). The plaintiff alleges that Michael Watts omitted to report that several weeks earlier, Hyperdynamics had been notified that its oil and gas concession from the government of Guinea had been terminated. This information was revealed on July 28, 2005, when Michael Watts again stated that Hyperdynamics "desperately needed" to sell additional units in the Norris Lease offering. (*Id.*, ¶ 80). The plaintiff alleges that it purchased 3 units on July 22, 2005, in response to the statements that there was an urgent need for $150,000 to meet the Hyperdynamics payroll as well as other representations. The plaintiff appears to allege that the delay in revealing the potential loss of the Guinea concession from July 22, 2005 to July 28, 2005 was a material omission.

This allegation fails, as a matter of law. The plaintiff was given the information 6 days later and purchased an additional 7 units after learning it. Even before learning of the potential loss of the Guinea concession, the plaintiff was told that Hyperdynamics was in severe financial distress and that the Louisiana wells were "sustaining the company's market value." (*Id.*, ¶ 79). These facts lead to the conclusion that the plaintiff did not view this

---

allegation that the projections as to gas production and the resulting cash flow and rate of return were made with knowledge that they could not be achieved. They are properly considered in analyzing the sufficiency of the allegations that the defendants made misrepresentations with the required scienter.

omission as material and did not rely on the continued presence of the Guinea concession in making the July 22, 2005 purchases. *Zonagen*, 267 F.3d at 407. The allegation that the delay in revealing the potential loss of the Guinea concession was a material omission is dismissed.

The defendants move to dismiss the allegation that a one-page marketing brochure issued by Trendsetter Production and sent to Moore by Michael Watts on July 28, 2005 contained misrepresentations. The amended complaint alleges that the brochure stated that "an independent engineering study indicates 940,000 barrels of oil in place and a yet undetermined amount of gas on the Norris Lease." (Docket Entry No. 22, ¶ 64). The plaintiff asserts that the marketing brochure was false because in Hyperdynamics's S-1 filing with the SEC, it stated that it did not have a "report from an independent petroleum engineer" and it did not have "internal estimates of proved developed and undeveloped reserves." (*Id.*, ¶ 66).

The defendants point out that the brochure used the words "estimated," "projection," and "yet undetermined" to describe the amounts of oil and gas. The July 2005 brochure did not use the word "independent," as the plaintiff alleges, but stated that an "[e]ngineering study indicates 940,000 barrels of oil in place and a yet undetermined amount of gas," projecting 540,000 recoverable barrels and estimating "1,429,000 MMBtu's" of gas production. (Docket Entry No. 28, Ex. E). This does not contradict the S-1 filing. The report from Charles Moffett is identified in the February 10, 2005 letter signed by Sam Spears and given to the plaintiff as a report that was completed in only five days and was

45

concededly incomplete.  The Moffett report did not estimate proved reserves.  The two reports from Bayou Resources are geological studies, not engineering reports, and did not purport to estimate proved developed or undeveloped reserves.  The July 2005 brochure does not estimate "proved" developed or undeveloped reserves.  The allegations that the July 28, 2005 marketing brochure misrepresented the engineering studies are dismissed, with one exception.

The plaintiff alleges that the brochure issued by Trendsetter Production and sent by Michael Watts projected "annual production rates of 47,000 barrels of oil from the Norris Lease over twelve years, with an internal rate of return of 219% and a total investment return of an impressive 820%." (Docket Entry No. 22, ¶ 64).[6]  The allegation that the July 28, 2005 investment brochure was misleading in projecting the production rates and cash flow from the Norris Lease and Kelley Lease withstands the motion to dismiss.  The plaintiff has alleged that Hyperdynamics, Trendsetter Production, Kent Watts, Harry Briers, and Michael Watts had information about the difficulty in recovering large amounts of oil from the Norris Lease wells and the likely rates of production from those wells of 2 to 3 barrels per day, with extensive and frequent shutdowns, that made the production rates and cash flow projections unreasonable.  The motion to dismiss the statements as to projected production rates and cash flows is denied; the motion to dismiss the remaining allegations in the July 28, 2005

---

[6] The plaintiff appears to allege that this investment brochure covered not only the Norris Lease, but also the Kelley Lease. (*Id.*, ¶ 82).  This is, however, unclear; the brochure only refers to a total of 14 wells and related infrastructure, the number of wells contemplated for the Norris Lease.  (Docket Entry No. 28, Ex. E).

marketing brochure is granted.

The plaintiff also asserts that Kent Watts, Harry Briers, and Michael Watts all pressured Spears to agree that the Norris Lease wells would produce larger amounts of oil than Spears had told them.  (Docket Entry No. 22, ¶ 47).  The plaintiff has sufficiently alleged that Kent Watts and Harry Briers are also responsible for the statements as to projected production rates and cash flows in the July 28, 2005 investment brochure issued by Trendsetter Production.  *Southland*, 365 F.3d at 363–65.

On July 29, 2005, Hyperdynamics issued another press release containing a statement, purportedly by Sam Spears, that the 12 wells already drilled were merely "awaiting completion of a gas pipeline contract" that would "allow the wells to begin producing and selling gas once the contract was finalized so the wells could connect to a local pipeline." (Docket Entry No. 22, ¶ 74).  The defendants move to dismiss the allegation that this press release misrepresented the status of the gas-production infrastructure construction.  The defendants provide the text of the press release.  It states that 12 of the wells are "awaiting completion of a gas pipeline contract so we can execute our gas sales contract.  This will give us what we need to connect with a local pipeline located on the property and commence selling our natural gas."  (Docket Entry No. 11, Ex. I; Docket Entry No. 28 at 17).  This press release does not, as the plaintiff alleges, state that the connection to the local pipeline had already been constructed.  To the contrary, the press release makes it clear that the connection to the local pipeline was not yet in place.  The motion to dismiss the allegation that the July 29, 2005 press release misrepresented the status of the gas-production

infrastructure construction is granted.

### E.     The Allegations as to Christopher Watts's Blog Postings

Christopher Watts and the other defendants move to dismiss the allegations that the September 17, 2005 and October 5, 2005 postings on the Hyperdynamics website about the natural-gas production on the Norris Lease were misrepresentations.  The September 17, 2005 posting stated:  "[A]t this moment in time, we are not producing any NG [natural gas], however we are currently working on updating our operations to handle the sales and production of NG," and  that "the time to get the gas online should be anywhere from 3–6 weeks."  (Docket Entry No. 22, ¶ 76).  The October 5, 2005 posting stated that "oil production is up for Louisiana operations" and that "Hyperdynamics Resources is still on track with gas production."  (*Id.*).  These are the only alleged misrepresentations attributed to Christopher Watts.

The defendants move to dismiss these allegations because they are neither material nor are they misrepresentations.  (Docket Entry No. 28 at 17–18; Docket Entry No. 29 at 6–8).  The allegations are not, as a matter of law, sufficient to withstand dismissal.  First, the representations do not specifically discuss the construction of gas-production infrastructure on the Norris Lease, as opposed to the other activities necessary to produce and sell natural gas.  The plaintiff alleges that it received other information that it was necessary not only to construct a gas-gathering system connecting to the local pipeline, but also to negotiate and execute a gas-pipeline contract and a gas-sales contract.  The blog postings did not materially alter the total mix of information available.  *See Basic, Inc. v. Levinson*, 485 U.S. 224,

48

231–32 (1988).

The plaintiff does allege that the 6-week timetable projected in September 2005 for getting the gas "online" and the statement 3 weeks later that gas production was "on track" were inconsistent with information that the actual construction did not begin until sometime in November 2005.  (Docket Entry No. 22, ¶ 77).  There is no allegation, however, that the plaintiff relied on these postings or that they altered the total mix of information available.

The plaintiff also alleges that on October 10, 2005, in a telephone call from Moore, Briers allegedly stated that the natural gas on the Norris Lease wells would be "hooked up . . . by the end of next week."  (Docket Entry No. 22, ¶ 76).  Two days later, Briers wrote a letter to the plaintiff's investors stating that, "by the end of October," the gas collection system on the Norris wells would be "online" and that revenues would increase by approximately $23,500 per month thereafter.  (*Id.*).  Given these allegations, which the defendants do not specifically address, the Christopher Watts blog postings did not, as a matter of law, materially alter the mix of information.  Nor is there a sufficient basis in the pleadings to create the necessary inference that Christopher Watts made these statements with the requisite state of mind. *Zonagen*, 267 F.3d at 407.  The allegations as to Christopher Watts and the blog postings in September and October 2005 are dismissed.

The plaintiff also fails to plead facts to support a scienter inference as to Briers's statements made during the October 10, 2005 phone call or in the October 12, 2005 letter. The amended complaint alleges that the statements turned out to be false; the production infrastructure was not completed until late November 2005.  Spears allegedly told the

49

defendants repeatedly of the need to "get a gas gathering system built and in place" long before this time.  (Docket Entry No. 22, ¶ 77).  The plaintiff also alleges that Briers had personal financial motives in the investment through his 3.1% stock holding in Hyperdynamics.  (*Id.*, ¶ 87).  Considered  as a whole, however, these allegations fail to support the strong inference of scienter needed in a securities-fraud action.  The plaintiff makes no allegation that Briers knew or had reason to believe that the statements about the completion of the production infrastructure were false when he made them in October 2005.  "More than allegations of motive and opportunity" are required to withstand dismissal.  *See Goldstein*, 340 F.3d at 250–51.

### F.    Summary of the Remaining Claims

The following misrepresentation and omission claims survive the defendants' motions to dismiss:  (1) the allegation that Michael Watts made statements at the March 16, 2005 meeting that the Norris Lease wells would produce between 10 and 15 barrels of oil per day, (Docket Entry No. 22, ¶ 45); (2) the allegation that the February 15, 2005 investment brochure issued by Trendsetter Production, sent by Michael Watts, and linked to Kent Watts and Harry Briers, contained misrepresentations by projecting production of 16,730 barrels of oil in the first year and over 69,000 barrels over the first 8 years for 10 acres of the 40-acre Norris Lease, (*id.*, ¶ 48); (3) the allegation that Michael Watts misrepresented the risks of investing in the Norris Lease by stating that the investment only carried two risks, (*id.*, ¶ 51); (4) the allegation that Michael Watts and Hyperdynamics misrepresented the Moffett engineering report in the February 15, 2005 investment package by including a letter from

50

Sam Spears that omitted critical information, (*id.*, ¶ 60); and (5) the allegation that the July 28, 2005 marketing brochure issued by Trendsetter Production, sent by Michael Watts, and linked to Kent Watts and Harry Briers, contained misrepresentations by projecting annual production rates of 47,000 barrels of oil over 12 years and an internal return rate of 219% and a total investment return of 820%, (*id.*, ¶ 64).

## V.     Analysis of the Allegations of Control-Person Liability

The plaintiff also alleges control-person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as to Hyperdynamics, Kent Watts, Michael Watts, and Harry Briers. Control-person liability under Section 20(a) requires that the plaintiff adequately allege an underlying violation of the Exchange Act by the controlled person and that the controlled person be under the control of the defendant; primary liability by the control person is not a necessary predicate to a Section 20(a) claim. *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). The plaintiff has adequately alleged several underlying violations of the Exchange Act in the publications issued by Trendsetter Production. (Docket Entry No. 22, ¶¶ 48, 64). The amended complaint asserts that Trendsetter Production was operated as a "mere tool and business conduit" of Hyperdynamics and that Hyperdynamics controlled Trendsetter Production—its wholly owned subsidiary—when the press releases were issued. (*Id.*, ¶ 26). These allegations support a claim for control-person liability as to Hyperdynamics under Section 20(a).

The plaintiff alleges that Michael Watts acted under the "direction" of Kent Watts, the Chairman and Chief Executive Officer of Hyperdynamics, and Harry Briers, the Chief

51

Operating Officer of Hyperdynamics, who "by virtue of their positions . . . actually exercised the power to control the operations of Hyperdynamics and the statements and misrepresentations it made to the public and to Plaintiff." (*Id.*, ¶ 21). The amended complaint adequately alleges underlying misrepresentations and omissions by Michael Watts. (Docket Entry No. 22, ¶¶ 45, 48, 51, 60, & 64). The plaintiff also alleges that Kent Watts and Harry Briers "ignored, overruled and countermanded" Spears, President of Trendsetter Production, and issued statements on his behalf, asserting that Kent Watts and Harry Briers asserted control over Trendsetter Production. (*Id.*, ¶ 23). The amended complaint alleges several instances of this exercise of control, including when production forecasts were allegedly misrepresented in the February 15, 2005 investment brochure. The plaintiff alleges that Spears told Kent Watts, Harry Briers, and Michael Watts that their production and rate-of-return projections were incorrect. (*Id.*, ¶ 47). These allegations meet the relaxed Section 20(a) pleading requirements. *Dennis*, 918 F.2d at 509.

The plaintiff also alleges that Michael Watts acted as a Section 20(a) control person over Hyperdynamics: "Defendant Michael Watts, by virtue of his position as the chief consultant for Hyperdynamics . . . had the power and did exercise control over the activities, including the statements and dissemination of information, of Hyperdynamics . . . ." (Docket Entry No. 22, ¶ 21). The plaintiff has adequately alleged an underlying misrepresentation by Hyperdynamics. (*Id.*, ¶ 60). Control-person liability under Section 20(a) of the Exchange Act is not limited to employers, officers, or directors of a company but can encompass any person who possess the power to influence the operations and activities of the primary

violator.  *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981).

The SEC defines control as "the possession, direct or indirect, of the power to direct or cause

the direction of the management and policies of a person, whether through the ownership of

voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  Congress envisioned a

broad definition of control:

> [W]hen reference is made to "control," the term is intended to
> include actual control as well as what has been called legally
> enforceable control. . . . It was thought undesirable to attempt to
> define the term.  It would be difficult if not impossible to
> enumerate or to anticipate the many ways in which actual
> control may be exerted.  A few examples of the methods used
> are stock ownership, lease, contract, and agency.

H.R. REP. NO. 1383, 73rd Cong., 2d Sess. 26 (1934).

The plaintiff has alleged that Michael Watts was responsible for distributing

information to the public on behalf of Hyperdynamics, including the February 15, 2005

investment package that is the subject of Hyperdynamics's underlying violation.  Although

he was a consultant of Hyperdynamics and not an officer or director, the amended complaint

alleges that Michael Watts had "a lead role in marketing the investment offering to Plaintiff"

and exercised significant control over the day-to-day operations concerning the information

disseminated about Hyperdynamics.  (Docket Entry No. 22, ¶¶ 32, 98).  The motion to

dismiss the allegation that Michael Watts was a control person of Hyperdynamics is denied.

## VI.    Conclusion

The motion to dismiss the claims against Hyperdynamics, Kent Watts, Michael Watts,

and Harry Briers is granted in part and denied in part.  The motion to dismiss the claims

against Christopher Watts is granted.  All claims against Christopher Watts are dismissed with prejudice.

SIGNED on January 18, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge